DECISION
This matter is before the Court for decision with respect to Receiver Allan M. Shine's (the "Receiver") Motion for a Determination of the Competing Property Rights to Equipment. The Receiver is joined by D.B. Zwirn Special Opportunities, LTD, H/Z Holdings, LLC, and D.B. Zwirn Special Opportunities Fund, L.P.. Memoranda in support of the Motion to Determine Competing Rights to Property were submitted by Allan M. Shine, H/Z Holdings, LLC, D.B. Zwirn Special Opportunities Fund, L.P., MT Credit Services, LLC, and Art Guild of Philadelphia, Inc.
 I Facts and Travel The facts giving rise to the instant dispute are uncontroverted. In September 2004, Eastern Wire Products, Co. ("Wire") entered into an equipment lease with MT Credit Services, LLC ("MT"), which covered the equipment in dispute in this case. Thereafter, in June 2005, Wire, a Rhode Island Corporation, transferred the leased equipment in question to Eastern Display Acquisition, Inc. ("Display"), a Delaware *Page 2 
corporation. It is the equipment that is at the heart of this dispute. In 2004, Display entered into multiple equipment lease agreements with MT and took over the rights of Wire as a result. MT had previously filed a valid financing statement with the Rhode Island Secretary of State to perfect its interest in the above-mentioned equipment as it pertained to its original lease with Wire. In June 2005, however, Wire transferred its interest as debtor in the equipment, as well as the accompanying software, to Display, a Delaware corporation.
MT was a secured creditor of Wire at the time of the transfer from Wire to Display having already perfected its interest against Wire by filing an appropriate financing statement with the Rhode Island Secretary of State. MT did not, however, re-file in Delaware upon the transfer to Display. (See discussion infra. at 3). Because Display is a corporation organized under the laws of Delaware, the transfer triggered a requirement under Rhode Island law that MT re-file its financing statement with the Delaware Department of State in order to continue perfection.
H/Z Holdings, LLC and D.B. Zwirn Special Opportunities Fund, L.P. — both senior secured creditors of Display — also assert a claim to the equipment. Each of these entities claim to have perfected their respective security interest by the filing of a financing statement with the Delaware Department of State by Holdings, as collateral agent for Holdings and Zwirn. (Pet.'s Post Hr'g Br. 2.)
On February 28, 2007, this Court appointed Allan M. Shine Receiver of Display. Subsequently, on April 11, 2007, this Court entered an Order approving the sale of assets by Display to Art Guild of Philadelphia, Inc. ("Art Guild"). This matter is now before this Court to resolve competing claims to property, specifically, the equipment in which *Page 3 
Display once maintained an interest as debtor. The equipment in question consists of a Motoman SK6 Robot and a Bliss O.B.I. Power Press.
 II Analysis A. Continued Perfection of Security Interest
MT, which perfected its security interest in the equipment owned by Wire, a Rhode Island corporation, in 2004, argues that the period in which it must re-file a financing statement — upon transfer of the assets from Wire to Display — a Delaware corporation — did not begin to run until Display became bound under the security agreement. (See Memorandum in Support of MT in Connection with the Motion to Determine Competing Property Rights.) MT's argument, however, is inconsistent with the clear and unambiguous language set forth in our statute.[1] See G.L. 1956 § 6A-9-316.
Section 6A-9-301(1) of the Rhode Island General Laws provides the mandatory time frame during which a financing statement must be filed for the adequate perfection of a security interest. The purpose of such filing is, of course, to put the world on notice that a perfected security interest in the specified collateral exists in favor of the named secured party. To this end, section 6A-9-301(1) requires a secured party to re-file upon certain changes in involved parties' circumstances, i.e., changes in address, relocation of collateral, merger, etc.. The General Laws further dictate that a debtor's location may be determined by a debtor's primary "place of business." G.L. 1956 § 6A-9-307. The statue also specifies that the following rules apply to various forms of debtors: (1) a "debtor *Page 4 
who is an individual is located at the individual's principal residence"; (2) a "debtor that is an organization and only has one place of business is located at it place of business"; and (3) a "debtor that is an organization and has more than one place of business is located at its chief executive office." G.L. 1956 § 6A-9-307(b). Moreover, as section 6A-9-307(e) points out, "[a] registered organization that is organized under the laws of a State is located in that state." As applied to Display in the instant matter, the statute clearly demonstrates that because Display was organized under the laws of Delaware, its location as a debtor is in that State.
Upon transfer of a debtor's collateral to a third party, section6A-9-316(a)(3) of the R.I.G.L. mandates that a secured party re-file its financing statement in the new debtor's location, as is defined above, to maintain its perfection. Here, Display's location as a debtor is Delaware, which mandates the need for proactive steps to be taken to maintain perfection. Specifically, 6A-9-316(a)(3) states that "a security interest perfected pursuant to the law of the jurisdiction designated in § 6A-9-301(1) or 6A-9-305(c) remains perfected until the . . . expiration of one year after a transfer of collateral to a person that thereby becomes a debtor and is located in another jurisdiction." G.L. 1956 § 6A-9-316(a)(3). In fact, a plain reading of the comments to the aforementioned section demonstrates that the date upon which this clock begins to run is the date on which the transfer takes place.See id. at note 2.
In the instant matter, the "transfer" took place at the time Display acquired its interest in the equipment and software from Wire, which occurred in June of 2005. This acquisition made Display the debtor, that is, even before it became an "obligor." Subsequently, Display assumed Wire's past responsibilities in the lease agreements *Page 5 thereby becoming a "debtor" under the meaning of the R.I.G.L.See G.L. 1956 § 6A-9-102(28)(i). Section 6A-9-102(28)(i) defines "debtor" for the purposes of secured transactions. Specifically, it states that a debtor includes any "person having an interest, other than a security interest or other lien, in the collateral, whether or not theperson is an obligor." G.L. 1956 § 6A-9-102(28)(i), (emphasis added).[2] Despite efforts to successfully fulfill the obligations of the lease, Display defaulted on its obligations under the MT lease.
MT argues that the word "thereby" in the statute implies that a transfer does not actually occur until the new debtor becomes bound under the security agreement, which MT maintains did not take place until December of 2006 upon the finalization of a settlement agreement. The Court finds this argument without merit and suggests that the distinction between a debtor and an obligor may have escaped MT. As the Receiver points out, MT's obligation to re-file began to run upon the transfer of the equipment from Wire to Display that took place on or about June 7, 2005.
This "transfer" took place at the time an interest in the collateral (the equipment) was acquired by Display in this initial transaction. It was the newly developed interest, therefore, that commenced the one year time period during which MT had to have re-filed in order to maintain continued perfection. See G.L. 1956 § 6A-9-316. In fact, as comment 2 to § 6A-9-316 makes clear, this lengthened time period gives the secured party ample opportunity to exercise due diligence to ensure continued perfection. Id. In *Page 6 
the instant matter, the time period in which MT could have maintained its perfection lapsed in June of 2006. Waiting until December 19, 2006 — which marks the date that Display "assumed" the lease, not the actual transfer of interest in the equipment — was a misapplication of section6A-9-316(a)(3). Because the interest in the equipment shifted from Wire, a Rhode Island corporation, to Display, a Delaware corporation, a new financing statement in Delaware was necessary to maintain perfection.
Having failed to file a new UCC financing statement reflecting the change in debtor's location within the required timeframe, MT lost its status as a secured lender, as well as any interest in the collateral in question. MT, therefore, has no interest beyond that of a general creditor.
 B. Classification of Equipment
Having found that MT has no secured interest in the contested collateral, the Court must now determine which of the remaining parties has superior rights. To do so the Court looks to both the lease agreement between MT and Display, as well as the Offer to Purchase, as approved by this Court, between Art Guild and the Receiver. We begin with the determination of whether the equipment in question was to be excluded from the sale to Art Guild as leased equipment.
The Rhode Island Uniform Commercial Code provides the appropriate framework for determining whether an agreement designated as a lease is actually a disguised sale. G.L. 1956 § 6A-1-201(37). Under §6A-1-201(37), if the debtor has the right to terminate the purported lease prior to the expiration of its terms, it will satisfy the bright line test and ultimately be deemed a lease. If, however, as is the case here, the "lessee" does not have *Page 7 
the right to terminate, a further analysis must be made. First, the Court must look to whether the original term of the lease is greater to or equal to the economic life of the lease. Second, the Court must determine whether the lessee is bound to renew the lease for the economic life of the good. Third, the Court must determine whether or not the lessee has the option to renew for no or nominal consideration. Finally, the Court must determine whether or not the lessee has the option to buy for no or nominal consideration at the end of the lease period. If any of these four prongs is met, the Court may find that the agreement in question actually represents a disguised sale agreement.See id.
Here, the lease agreement allows for a one dollar purchase option at the expiration of the lease period, satisfying the fourth prong of the test. Although the General Laws state that where the lessor has the potential to regain possession at the end of the lease period while the goods maintain their economic life is indicative of a lease, it appears that this agreement otherwise meets the test as espoused in §6A-1-201(37) of the R.I.G.L.
In dispute here is whether the leased equipment is to be considered part of the final sale of assets as negotiated between the Receiver and Art Guild. The Receiver argues that the financing transactions pertaining to the equipment created lease agreements. Moreover, during the hearing to approve the sale to Art Guild, the Receiver specifically stated that they were leased items and as such would not be included in the sale of assets. The following is an excerpt of the transcript from the hearing that took place before this Court on April 11, 2007, offered here to establish the intent of the parties at the time of the contract:
 Ms. Finkle (for the Receiver): "The offer excludes leased equipment. This is standard for the Receiver. But in this situation where the purchase price was not that substantially greater than liquidation value, with the risk of *Page 8 
that liquidation value, I said I was not going to get involved with the assumption of equipment leases. . . . So, they were purposely excluded." (Apr. 11, 2007 Hearing Transcript at 8).
Shortly thereafter, Ms. Finkle expounded further regarding the specific equipment at dispute in the instant matter:
 Ms. Finkle (in response to questioning on the equipment in controversy): "I believe while they are leases, they're financing leases; and I think between the Receiver and Mr. Orson's client, the plaintiff here, they are an unperfected lessor who loses out to our lien statutes. On that situation I have not sold those assets to the buyer." (Id. at 11, emphasis added).
Finally, Ms. Finkle discussed the future of the equipment in a possiblefuture sale to Art Guild:
 Ms. Finkle: "[Art Guild] can say since I didn't sell them, this asset, to them, if they want it for 22 or 23,000, you know, in escrow with me, we have a determination on the lease issue and the secure — the perfection issue with MT. If I prevail, the money comes out as an asset to the receivership estate and I can give them, a buyer, a bill of sale. If I don't prevail, they have to make arrangements with this lessor if they want it.
 Now, they can tell me they're not interested in it, in which case it's strictly an issue between MT, the Receiver, and Mr. Orson." (Id. at 12).
Art Guild, which was represented at the above-quoted hearing, did not object to the stated classification of equipment as excluded from the sale at the time an order was entered shortly after the hearing. In fact, as a result, it is the receiver's contention that Art Guild is summarily estopped from asserting any property interest in the equipment at issue. In sum, the Receiver asserts that Art Guild's failure to contest the designation of the equipment subject to the lease with MT as "leased" — which the Receiver pointed out is *Page 9 
specifically excluded from the final Offer to Purchase — would result in prejudice to the receivership estate. See discussion infra. at 9.
In opposition, Art Guild argues primarily that it deserves and is entitled to the benefit of the bargain as a result of its purchase and sale agreement as negotiated with the Receiver. In addition, that in order for the doctrine of estoppel to take effect, Art Guild would have had to acquiesce and prejudice would have to result. General AccidentIns. Co. of Am. v. Nat'l Fireproofing, 716 A.2d 751 (R.I. 1998). Art Guild contends that neither has nor will occur here if it is awarded the equipment. Moreover, that the Receiver, as well as D.B. Zwirn merely seek to obtain a windfall as a result of MT's failure to timely perfect its own interest.
The Offer to Purchase states that the agreement does not include leased equipment. Paragraph three of the offer expounds certain named assets that shall be "expressly excluded from the sale and conveyance of the assets." See Offer to Purchase at p. 3. Among the list of excluded assets is: "any and all leased equipment, machinery, or other leased asset and any assets used in Defendant's business operations but not owned by Defendant." Art Guild's failure to raise an objection to this specific designation as it was addressed in this Court earlier this year constitutes acquiescence to the terms therein. See General Accident Ins.Co. of Am., 716 A.2d 751. This Court issued an Order Granting the Receiver's Petition to Sell the Assets Free and Clear of Liens as a result of the aforementioned hearing. The order was entered and dated April 11, 2007.
In determining the ultimate ownership rights in this equipment, the Court must look finally to the Offer to Purchase between Art Guild and the Receiver and the intent of each party as to what would be included. This Court held a hearing on April 11, 2007, during *Page 10 
which the Offer to Purchase was discussed by counsel to the various parties involved in this suit, which included representation for Art Guild. The agreement specifically indicated that the now contested equipment would not be included in the final sale and disposition of the assets to Art Guild. As noted above, no objection was raised by counsel at that time. The Offer to Purchase was approved by this Court, and the intention of the parties that the equipment was not included in the sale was clear on that date.
As counsel for the Receiver pointed out, the equipment was leased, although it was a finance lease, and that it was understood among the parties that this would not be included. (Hr'g Tr. 11, Apr. 11, 2007.) Ms. Finkle further stated that "since [she] didn't sell them, this asset, . . . if they want it for 22 or 23,000 . . . in escrow with me, [until] we have a determination on the lease issue and the . . . perfection issue with MT." Id. at 12. It is clear to the Court that this equipment was not contemplated by any involved party to be an asset of the receivership estate to be sold pursuant to the Offer to Purchase between the Receiver and Art Guild. The intent of the parties at the time of the Offer to Purchase was to do nothing more with the equipment than to wait and see the outcome of the MT perfection issue. As the transcript from the April 11, 2007, hearing evidences, it was the intent of the Receiver to potentially sell the equipment to Art Guild at an additional cost in a separate and distinct transaction from the original purchase agreement.
The parties' intent must prevail here. See Woonsocket Teachers' Guildv. Sch. Comm., 117 R.I. 373, 376 (1976). It is evident from both the Offer to Purchase and the hearing held by this court that the parties never intended to include equipment subject to a lease. Whether the lease was a "true lease" or a "financing lease," is not determinative. *Page 11 
Rather, that both parties acquiesced to the fact that the equipment in question was, in fact, leased at the time of the sale, clearly excluding it from the Offer to Purchase as presented on April 11, 2007. (See Hr'g Tr. 10-12, Apr, 11, 2007.)
Finally, while it is clear from the language of the Offer to Purchase, which this Court approved on April 11, 2007, that leased equipment was to be expressly excluded from the sale agreement between the Receiver and Art Guild, there has been contention as to whether this equipment should, in fact, be deemed "leased." Although this equipment is not the subject of a "true lease" under the meaning of the R.I.G.L, which have adopted the U.C.C. definitions, it was in fact subject to a financing lease. To this end, Art Guild, who failed to object to the classification of this equipment as leased at the April 11, 2007, hearing, is now unable to properly assert that it was to be part of the assets included in the Offer to Purchase. The intent of the parties clearly show that this equipment was treated as leased and therefore excluded from any purchase and sale arrangement between the Receiver and Art Guild. Art Guild is, therefore, estopped from claiming the contrary.
The findings here only dictate rights as between the Receiver, Display, and MT. The Court anticipates further determinations may be necessary regarding the relative positions of the Receiver, D.B. Zwirn, and H/Z Holdings.
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court finds that the receivership estate has the superior interest in the equipment under contention.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] R.I. General Law § 6A-9-301(1) states that "[e]xcept as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." R.I. Gen. Laws § 6A-9-301(1).
[2] Under section 6A-9-102(59) of the R.I. General laws, an `"[o]bligor' means a person that, with respect to an obligation secured by a security interest in or an agricultural lien on the collateral, (i) owes payment or other performance of the obligation, (ii) has provided property other than the collateral to secure payment or other performance of the obligation, or (iii) is otherwise accountable in whole or in part for payment or other performance of the obligation. The term does not include issuers or nominated persons under a letter of credit."